IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHELLEY HAUSE and STEPHEN HAUSE                              PLAINTIFFS

V.                                CASE NO. 5:24-CV-5143

CITY OF FAYETTEVILLE, ARKANSAS                              DEFENDANT

MEMORANDUM OPINION AND ORDER

TABLE OF CONTENTS

I. BACKGROUND ............................................................................................. 2

II. DISCUSSION ............................................................................................... 5

    A. Justiciability ........................................................................................... 5

        1. Standing ........................................................................................... 5

        2. Arkansas Law and the Court's Jurisdiction ............................... 11

        3. Abstention ...................................................................................... 12

        4. Duplicative Litigation .................................................................... 14

        5. Collateral Estoppel ....................................................................... 14

    B. Preliminary Injunction ......................................................................... 15

        1. Likelihood of Success on the Merits ........................................... 15

        2. Likelihood of Irreparable Harm .................................................... 29

        3. Balance of Equities and the Public Interest ............................... 31

III. CONCLUSION ........................................................................................... 32

Plaintiffs Shelley and Stephen Hause bring this suit challenging Fayetteville's short-term rental ordinance. The ordinance creates various requirements for operating a short-term rental and limits the number of short-term rentals allowed to operate in Fayetteville. Plaintiffs purchased a house in Fayetteville after the ordinance had gone into effect, believing they would be able to get the permit and license needed to operate the house as a short-term rental. They were unable to secure the necessary permit and have filed suit in state and federal court seeking to have the ordinance declared unconstitutional and the City of Fayetteville enjoined from enforcing it.

Now before the Court are the City's Motion to Dismiss (Doc. 13), Plaintiffs' Response in Opposition (Doc. 15), Plaintiffs' Motion for Preliminary Injunction (Doc. 18), and the City's Response in Opposition (Doc. 20). On November 20, 2024, the Court held a hearing on the Motions and took the matter under advisement. Having considered the matter fully, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction and **DISMISSES** Counts II and V of their Amended Complaint (Doc. 11) for the reasons explained herein.

## I. BACKGROUND

In 2021, the City of Fayetteville enacted an ordinance (the "Ordinance") regulating short-term rentals ("STRs"), which had previously been treated as hotels/motels and were therefore prohibited from operating in residential zoning districts. (Doc. 2-1). The Ordinance defines an STR as a residential dwelling or portion thereof rented out "for a period of less than thirty (30) consecutive days." Fayetteville, Ark., Code of Ordinances § 118.01(E) (2024). The Ordinance divides STRs into two categories, "Type 1" and "Type 2." A Type 1 STR is principally used as a full-time residence; "The occupant or owner

must occupy the residence for nine (9) months of the year." *Id.* § 118.01(E)(1). A Type 2 STR "is not occupied by a permanent resident"; "The owner lists this property full-time as a short-term rental and has no intention of having permanent residents living in the property." *Id.* § 118.01(E)(2).

A license is required to operate both types of STRs. But a conditional use permit ("CUP") is also required before an operator can get a license to operate a Type 2 STR in a residential zoning district, and the Ordinance caps the total number of Type 2 STRs in the City at 475. *Id.* §§ 118.01(E)(2), (E)(16). The Ordinance also requires STR operators to maintain guest registration records detailing dates of occupancy, total number of guests, and rates charged. *Id.* § 118.01(E)(11).

Plaintiffs live in Texas, but their daughter is a student at the University of Arkansas. She has health issues that require her parents to make regular visits, so in 2023 they bought a house in Fayetteville. (Doc. 2, ¶ 8). When Plaintiffs bought the house, the City had not reached the 475 cap, so Plaintiffs assumed that if they applied for a CUP to operate the house as a Type 2 STR, the application would be granted. *Id.* at ¶¶ 8–9, 11. However, Plaintiffs' CUP application was denied by the City's Planning Commission because, although the city-wide cap had not been reached, the Commission was concerned about the concentration of existing Type 2 STRs in the neighborhood and the availability (or lack thereof) of street parking while construction in the neighborhood was ongoing. (Doc. 2-2, p. 7). Without a CUP, Plaintiffs cannot get a license to operate the house as an STR, so it has been sitting vacant between visits.

Plaintiffs initially tried to appeal the Planning Commission's decision to the Fayetteville City Council. Property owners, however, have no right to appeal a Planning

Commission's CUP denial to the City Council, but the City Council can review such decisions on the motion of three City Council members. Fayetteville, Ark., Code of Ordinances § 155.05(A)(3). No City Council members took up Plaintiffs' CUP denial, so Plaintiffs attempted to appeal to the Washington County Circuit Court under Arkansas District Court Rule 9. (Doc. 15-3). Their state court action was filed on December 6, 2023. *Id.* The Circuit Court denied Plaintiffs' request for a preliminary injunction (Doc. 15-2) and granted partial summary judgment for the City, dismissing Plaintiffs' as-applied challenges, because their appeal was untimely (Doc. 15-3). Plaintiffs are currently appealing both of the Circuit Court's orders to the Arkansas Supreme Court, and their facial challenges remain pending before the Circuit Court.

On July 14, 2024, more than seven months after filing suit in state court, Plaintiffs filed this federal action under 42 U.S.C. § 1983, urging that the Ordinance is unconstitutional on several bases: (1) it violates the dormant Commerce Clause; (2) it violates the right to interstate travel; (3) it is void for vagueness; (4) it constitutes a taking without just compensation; and (5) its guest registry requirement violates the Fourth Amendment.

The City filed a Motion to Dismiss asking the Court to dismiss or stay on a number of grounds but primarily centered on the pending state court litigation. Plaintiffs filed a Motion for Preliminary Injunction, seeking to enjoin the City from enforcing the Ordinance while this litigation is pending. The Court first addresses the justiciability issues raised by the City before turning to Plaintiffs' Motion for Preliminary Injunction.

## II.  DISCUSSION

### A.  Justiciability

#### 1.  Standing

Although not raised in its Motion to Dismiss, in its Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, the City argues that Plaintiffs do not have standing to seek an injunction. The City also challenges Plaintiffs' standing to bring their dormant Commerce Clause, right to travel, and Fourth Amendment claims in particular. Because standing is a jurisdictional prerequisite to the Court's consideration of Plaintiffs' claims, the Court takes it up first.

##### i.  Standing Generally

To establish Article III standing, a plaintiff must show that: (1) they have "suffered or likely will suffer an injury in fact"; (2) "the injury likely was caused or will be caused by the defendant"; and (3) "the injury likely would be redressed by the requested judicial relief." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024) (citations omitted). "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (quoting *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008)).

The City argues that, because the state court ruled that Plaintiffs could not bring their untimely challenge to the CUP denial in state court, Plaintiffs are not injured by the Ordinance as applied to them, and therefore lack standing. However, Plaintiffs have established an injury in fact: without a CUP, they cannot obtain a license to operate a Type 2 STR and are therefore prohibited from operating their house as such. *See Sarasota Wine Mkt., LLC v. Schmitt*, 987 F.3d 1171, 1178 (8th Cir. 2021) (finding injury

where seller was "prohibited from selling, delivering, or shipping wine . . . to its Missouri customers because it was not eligible for a Missouri off-premises retail license" (cleaned up)). It is not clear how the state court's decision resolves Plaintiffs' injury; if anything it reinforces it. And the second and third requirements are also met: this injury is traceable to the Ordinance and would be redressed by the Court enjoining its enforcement.

The City instead seems to be attempting to fit an exhaustion requirement into the standing analysis. It is well established that exhaustion of state remedies is not a prerequisite to suit under § 1983. *Carter v. Stanton*, 405 U.S. 669, 670–71 (1972) (per curiam) (holding that "the District Court plainly had jurisdiction of th[e] case pursuant to 42 U.S.C. § 1983" even though plaintiff did not "appeal from a county decision denying welfare assistance"). A plaintiff's failure to exhaust state remedies does not deprive them of standing. *Sabri v. Whittier All.*, 833 F.3d 995, 999 (8th Cir. 2016). Thus Plaintiffs have standing, generally, to challenge the Ordinance.

ii. Standing: Dormant Commerce Clause

With respect to the dormant Commerce Clause claim, the City argues that Plaintiffs cannot challenge the Type 1 STR provision because they only want to operate a Type 2 STR. The Supreme Court has squarely rejected this argument. *Comptroller of Treasury v. Wynne*, 575 U.S. 542, 569 (2015). In *Wynne*, the Supreme Court held that the plaintiffs had standing to bring a dormant Commerce Clause challenge to a state tax scheme's treatment of out-of-state income even though the state could cure the dormant Commerce Clause violation without lowering the plaintiffs' tax burden. *Id.* "Whenever government impermissibly treats like cases differently, it can cure the violation by either 'leveling up' or "leveling down.'" *Id.*

6

Here, too, Plaintiffs are not challenging the mere scope of the burden imposed on them by the Ordinance, but rather the different burdens imposed on out-of-state property owners as compared to state residents. The City could, for example, require CUPs for all STR operators (or none), but they cannot, as Plaintiffs have claimed, treat like property owners differently based on state residency. Thus, Plaintiffs have standing to bring their dormant Commerce Clause challenge to the Ordinance's entire purportedly discriminatory scheme even though their desired course of conduct may only be regulated under one of its provisions.

iii.  Standing: Right to Travel

With respect to Plaintiffs' right-to-travel claim, the City argues that Plaintiffs are asserting other people's right to travel, not their own. The Supreme Court's third-party standing doctrine establishes that "a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'" *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)). However, courts recognize a limited exception when the party seeking third-party standing shows "a 'close' relationship with the person who possesses the right" and "a 'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130 (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). In response, Plaintiffs point to *Craig v. Boren*, 429 U.S. 190 (1976), where the Supreme Court applied this exception and permitted a vendor to assert "the rights of third parties who seek access to their market or function." *Id.* at 195.

In *Craig v. Boren*, the Court examined the constitutionality of an Oklahoma law that prohibited the sale of 3.2% beer to men under age 21 and women under age 18. *Id.* at

192. Among the plaintiffs challenging the law was a man who was between 18 and 21 at the time the suit was filed but had aged out by the time it reached the Supreme Court. *Id.* The Court recognized third-party standing, noting that the objectives of its "salutary 'rule of self-restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill-defined and speculative" would not be furthered by denying third-party standing because doing so would "foster repetitive and time-consuming litigation" when the constitutional issue inevitably reappeared in a new case. *Id.* at 193–94 (quoting *Barrows v. Jackson*, 346 U.S. 249, 255 (1953)).

The same cannot be said here. The purposes of the third-party standing doctrine—avoiding unnecessary (and potentially unwanted) constitutional pronouncements and ensuring constitutional issues are sharply and concretely presented—would not be served by adjudicating unknown and unrepresented travelers' right-to-travel claims here. While the *Craig* vendor had a symbiotic relationship with her customers such that the constitutional issue was "presented vigorously and 'cogently'" even in their absence, the same cannot be said of Plaintiffs' relationship with their potential future guests. *Id.* at 194 (quoting *Holden v. Hardy*, 169 U.S. 366, 397 (1898)).

Here, Plaintiffs as putative rental operators do not necessarily have the same interests in zoning enforcement as their potential guests. While Plaintiffs are principally interested in "operating their business profitably," the potential guests whose rights they purport to assert may be more concerned about the risks associated with unlicensed, unregulated STRs. *Gold Cross Ambulance & Transfer v. City of Kansas City*, 705 F.2d 1005, 1016 (8th Cir. 1983); *see Rozman v. City of Columbia Heights*, 268 F.3d 588, 591

(8th Cir. 2001) ("[The landlord] lacked standing to claim that the notice requirement violated the tenants' rights because he cannot assert the rights of his tenants.").

Moreover, Plaintiffs have made no showing that guests burdened by the Ordinance are hindered in asserting their own rights. Unlike in *Craig*, the right at issue here is not "affected by concerns of imminent mootness," and Plaintiffs have not pointed to any other possible hurdles. *Gold Cross*, 705 F.2d at 1016. Given the risk of misaligned interests here, the Court is not willing to proceed in the absence of a plaintiff with a claim to the right in question.[1] Therefore, Count II of Plaintiffs' Amended Complaint (Doc. 11) is **DISMISSED** for lack of standing.

### iv.  Standing: Fourth Amendment

Finally, with respect to Plaintiffs' Fourth Amendment claim, the City argues that Plaintiffs cannot challenge the registry requirement because, although Plaintiffs have pled their desire to, they are not currently operating an STR and are therefore not subject to the registry requirement. In a similar case, the Eighth Circuit examined a challenge to a

---

[1] Additionally, Plaintiffs' argument for why this Ordinance violates their potential guests' right to travel would break new ground in an already confused area of constitutional law. Plaintiffs argue that the Ordinance places an unconstitutional burden "on transients' ability to find lodging" by "exclud[ing] them from certain [specifically residential] areas of the city." (Doc. 18-1 pp. 9, 12). Put differently, Plaintiffs argue that, because short-term renters are engaged in "ordinary living purposes such as relaxing, eating, sleeping, and bathing" that are consistent with residential use, restricting their ability to do so in accommodations located in residential neighborhoods unconstitutionally discriminates against them because they are not residents of Fayetteville. But Plaintiffs' argument is not limited to STRs. If Plaintiffs are correct that cities cannot exclude lodging facilities from residential neighborhoods, it would not just be STRs shoehorned into these neighborhoods, but also hotels, hostels, boarding houses, or any other facility whose guests are likewise engaged in ordinary living activities like sleeping and bathing. Plaintiffs cite no authority that supports such a sweeping proposition, and principles of judicial restraint counsel against considering Plaintiffs' desired constitutional pronouncement on behalf of parties who are not before the Court.

city's billboard ordinance. *Advantage Media, L.L.C. v. City of Eden Prairie*, 456 F.3d 793, 796 (8th Cir. 2006). There, the court acknowledged that the plaintiff had been injured by the denial of its permit application but held that it did not have standing to challenge the constitutionality of ordinance provisions that "were not factors in the denial of its permit applications." *Id.* at 799. Because the code's provisions were severable, the plaintiff had to "show injury, causation, and redressability with respect to each provision it challenge[d]." *Id.* at 801. Here, too, Plaintiffs must establish standing as to the registry requirement separate and apart from the provisions under which their CUP application was denied. *See* Fayetteville, Ark., Code of Ordinances § 10.07 (severability provision).

Plaintiffs have not alleged that the registry requirement has been enforced against them or will be at any time in the future, absent this Court's intervention on their other claims. "An allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *L.H. v. Indep. Sch. Dist.*, 111 F.4th 886, 893 (8th Cir. 2024) (quoting *Missouri v. Yellen*, 39 F.4th 1063, 1068 (8th Cir. 2022)). Generally, "[p]laintiffs have standing to challenge the facial validity of a regulation notwithstanding the pre-enforcement nature of a lawsuit, where the impact of the regulation is direct and immediate and they allege an actual, well-founded fear that the law will be enforced against them." *Gray v. City of Valley Park*, 567 F.3d 976, 984 (8th Cir. 2009). Put differently, "[w]here plaintiffs allege an intention to engage in a course of conduct arguably affected with a constitutional interest which is clearly proscribed by statute, courts have found standing to challenge the statute." *United Food & Com. Workers Int'l Union v. IBP, Inc.*, 857 F.2d 422, 428 (8th Cir. 1988).

Here, Plaintiffs have not alleged a well-founded fear that the registry requirement will be enforced against them: while Plaintiffs have alleged that they intend to operate their home as an STR, they have not alleged any desire to violate the registry requirement. Further, whatever infringement the registry requirement may work on STR operators, it has not put Plaintiffs "to the choice between abandoning his rights or risking prosecution" because they do not currently operate an STR and thus do not have an obligation to comply with the registry requirement. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 773 (2007). Plaintiffs have failed to demonstrate "circumstances that render the threatened enforcement sufficiently imminent." *L.H.*, 111 F.4th 886 at 895 (quoting *Sch. Of the Ozarks, Inc. v. Biden*, 41 F.4th 992, 1000 (8th Cir. 2022). Thus, they have not suffered the injury in fact necessary to bring a challenge to the Ordinance's registry requirement, so Count V of Plaintiffs' Amended Complaint (Doc. 11) is **DISMISSED** for lack of standing.

### 2. Arkansas Law and the Court's Jurisdiction

In its Motion to Dismiss, the City argues that this Court lacks jurisdiction to hear Plaintiffs' as-applied challenges because they constitute "an appeal of the Planning Commission's decision." (Doc. 14, p. 15). The City points to the Arkansas rule limiting appeals from administrative decisions of municipal bodies and an Arkansas Supreme Court decision interpreting that rule as jurisdictional in nature. *Id.* at 15–16 (first citing Ark. Dist. Ct. R. 9; and then quoting *Combs v. City of Springdale*, 366 Ark. 31, 34 (2006)). This, the City argues, means that all courts, including this one, were divested of jurisdiction when the Circuit Court found that Plaintiffs' appeal was barred by the rule. *Id.* at 16.

This argument is plainly without merit. Although a state's laws may—in *diversity* cases—limit a federal court's jurisdiction, "where resort is had to a federal court not on grounds of diversity of citizenship but because a federal right is claimed, the limitations upon the courts of a State do not control a federal court sitting in the State." *Angel v. Bullington*, 330 U.S. 183, 192 (1947) (citing *Holmberg v. Armbrecht*, 327 U.S. 392 (1946)). Plaintiffs' claims under § 1983 asserting federal constitutional violations are federal claims; the Court's jurisdiction to hear them cannot be limited by state law.

### 3. Abstention

The City also argues that the Court has discretion to dismiss Plaintiffs' complaint in favor of the ongoing state court litigation. (Doc. 14, p. 7). The City cites both *Brillhart v. Excess Ins. Co.*, 316 U.S. 491 (1942) and *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976). Neither case or its progeny justify abstention here.

#### i. *Colorado River* Abstention

"Abstention from the exercise of federal jurisdiction is the exception, not the rule." *Id.* at 813. "Federal courts have a 'virtually unflagging obligation to exercise the jurisdiction given them,' which 'does not evaporate simply because there is a pending state court action involving the same subject matter.'" *Spectra Commc'ns Grp., LLC v. City of Cameron*, 806 F.3d 1113, 1121 (8th Cir. 2015) (cleaned up) (first quoting *Colo. River*, 424 U.S. at 817; and then quoting *Federated Rural Elec. Ins. Corp. v. Ark. Elec. Coops., Inc.*, 48 F.3d 294, 297 (8th Cir. 1995)). Thus, abstention under *Colorado River* is justified only in exceptional circumstances. *Id.* Assuming that the prerequisite of "parallel" state and federal actions is met, *see Fru-Con Const. Corp. v. Controlled Air, Inc.*, 574 F.3d 527,

535 (8th Cir. 2009), the City has not shown exceptional circumstances warranting abstention.

To determine whether exceptional circumstances exist, courts typically balance six non-exhaustive factors, "with the balance heavily weighted in favor of the exercise of jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 16 (1983). However while the City cites *Colorado River*, neither party discusses the *Colorado River* factors at all. Absent any argument as to how the *Colorado River* factors justify abstention in this case, the Court will not exercise its discretion under *Colorado River* to stay or dismiss it in favor of the state case. *See id.* at 19.

### ii. *Brillhart* Abstention

The City also argues that the Court has discretion to abstain under *Brillhart*. *Brillhart* recognized that federal courts have "broad discretion to abstain from exercising jurisdiction" in actions under the Declaratory Judgment Act "even if there are no exceptional circumstances as articulated in *Colorado River*" because the Declaratory Judgment Act states "that a court '*may* declare the rights and other legal relations of any interested parties seeking such declaration,'" not that it *must*. *Royal Indem. Co. v. Apex Oil Co.*, 511 F.3d 788, 792–93 (8th Cir. 2008) (quoting 28 U.S.C. § 2201(a)). Plaintiffs sued under 42 U.S.C. § 1983, not the Declaratory Judgment Act, seeking a declaration that the Ordinance is unconstitutional and an injunction barring the City from enforcing it. (Doc. 11, p. 15). "*Brillhart* applies to declaratory judgment actions generally, but not to actions that, like this one, involve good faith claims for injunctive relief." *Cedar Rapids Cellular Tel., L.P. v. Miller*, 280 F.3d 874, 879 (8th Cir. 2002). Therefore, the Court may not abstain under *Brillhart*.

### *4. Duplicative Litigation*

The City also argues that the Court can and should "decline to exercise their jurisdiction in order to prevent duplicative litigation." (Doc. 14, p. 8 (quoting *Missouri ex rel. Nixon v. Prudential Health Care Plan, Inc.*, 259 F.3d 949, 952 (8th Cir. 2001))). The City does not cite, and the Court is not aware of, any case where this rule was applied to concurrent litigation in state and federal court rather than multiple simultaneous cases in federal court. Bearing in mind the Court's virtually unflagging obligation to exercise its jurisdiction and the carefully cabined exceptions set out by the Supreme Court in respect of our federal system, the Court does not find fit to apply this "duplicative litigation" rule outside the context of its prior use.

### *5. Collateral Estoppel*

Finally, the City argues that Plaintiffs are collaterally estopped from challenging the constitutionality of the Ordinance as applied to them. Under Arkansas law, the party asserting collateral estoppel must show: "(1) the issue sought to be precluded must be the same as that involved in the prior litigation; (2) the issue must have been actually litigated; (3) the issue must have been determined by a final and valid judgment; and (4) the issue must have been essential to the judgment." *Zinger v. Terrell*, 336 Ark. 423, 430 (1999). Here, the state court granted summary judgment for the City because Plaintiffs' appeal of the Planning Commission's decision was untimely. Where a claim is found to be time-barred, the merits issues involved are not considered essential to the judgment. *See Alexander v. Twin City Bank*, 322 Ark. 478, 482 (1995) ("Judge Bogard's conclusions that there was no fraud and no fiduciary relationship were not essential to his judgment in view of his ultimate pronouncement that the statute of limitations barred the claims

whether or not they were true."). Thus, Plaintiffs are not collaterally estopped from raising their constitutional claims in federal court.

## B. Preliminary Injunction

In determining whether to grant a motion for preliminary injunction, the Court must weigh the following four considerations: (1) the movant's likelihood of success on the merits; (2) the threat of irreparable harm to the moving party; (3) the balance between the harm to the movant if the injunction is denied and the harm to the other party if the injunction is granted; and (4) the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981). "A preliminary injunction is an extraordinary remedy, and the burden of establishing the propriety of an injunction is on the movant." *Turtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

### 1. Likelihood of Success on the Merits

Generally, the movant for a preliminary injunction has shown a likelihood of success on the merits if they demonstrate a "fair chance" of prevailing on the merits. *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). However if the movant is seeking to enjoin the enforcement of a statute or regulation, they must show that their success on the merits is more likely than not. *Id.* This "more rigorous standard 'reflects the idea that governmental policies implemented through legislation or regulation developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly.'" *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)). Where a preliminary injunction is sought to enjoin a city's

ordinance, courts should "evaluate whether 'the full play of the democratic process[ ] was involved' in the action[ ] and 'then determine which standard would be more appropriate.'" *D.M. ex rel. Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, (8th Cir. 2019) (first alteration in original) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016)).

While Plaintiffs admit that the heightened "likely to prevail" standard applies to the Ordinance itself, they argue that the denial of their CUP application is merely an "administrative decision" not entitled to deference. (Doc. 18-1, p. 24). But Plaintiffs are not asking the Court to overturn the Planning Commission's decision and grant them a CUP, and the Court would certainly not be competent to do so. *See Littlefield v. City of Afton*, 785 F.2d 596, 607 (8th Cir. 1986), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019). No, Plaintiffs are asking the Court to enjoin the City from enforcing the Ordinance, the type of action which Plaintiffs admit must be examined under the higher "likely to prevail" standard. *Id.* at 23–24

i. Dormant Commerce Clause

Plaintiffs have argued that the Ordinance violates the dormant Commerce Clause by discriminating against out-of-state residents. Plaintiffs assert that the law is discriminatory because it forbids non-residents from obtaining Type 1 licenses. The law further discriminates against non-residents, Plaintiffs contend, because it makes Type 2 licenses—purportedly the only licenses available to non-residents—more difficult to obtain than Type 1 licenses. (Doc. 2, ¶¶ 22–26).

There is a circuit split on the constitutionality of various STR restrictions under the dormant Commerce Clause. The Ninth Circuit has held that Santa Monica's STR

ordinance, which banned STRs unless a primary resident was on site throughout the stay, did not violate the dormant Commerce Clause. *Rosenblatt v. City of Santa Monica*, 940 F.3d 439 (9th Cir. 2019). The Fifth Circuit, by contrast, has held that New Orleans' STR ordinance, which allowed STR licenses only for an owner's primary residence, violated the dormant Commerce Clause. *Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022).

Dormant Commerce Clause analysis is a two-step process. First, the Court must determine whether the Ordinance discriminates against out-of-state commerce. Second, the Court must apply the appropriate level of scrutiny: If the Ordinance is discriminatory, it is subject to strict scrutiny; if not, it is subject to *Pike* balancing. *SDDS, Inc. v. South Dakota*, 47 F.3d 263, 267–68 (8th Cir. 1995). Under *Pike*, a law violates the dormant Commerce Clause "if the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (quoting *Hampton Feedlot, Inc. v. Nixon*, 249 F.3d 814, 818 (8th Cir. 2001)).

In the dormant Commerce Clause context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994). However, "any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997). The courts in *Rosenblatt* and *Hignell-Stark* diverged on whether the ordinances at issue were distinguishing between substantially similar entities: the *Rosenblatt* court found that the Santa Monica ordinance was not discriminating against substantially similar STR

operations, while the *Hignell-Stark* court found that the New Orleans ordinance was. 940 F.3d at 451; 46 F.4th at 326. Thus, the *Rosenblatt* court applied *Pike* balancing, and the *Hignell-Stark* court applied strict scrutiny. 940 F.3d at 451; 46 F.4th at 328.

Here, the Fayetteville Ordinance looks more like the Santa Monica ordinance than the New Orleans ordinance. Like the Santa Monica ordinance and unlike the New Orleans ordinance, the Fayetteville Ordinance does not require that an STR be owner occupied. Thus, out-of-state owners like Plaintiffs could lease the house to a long-term tenant for nine months of the year and operate the house as a Type 1 STR for the other three— they just don't want to.[2] Instead, they want to operate the house as a Type 2 STR, an opportunity available on identical terms to residents and non-residents. Plaintiffs nonetheless claim that the Ordinance is more like the New Orleans ordinance based on their interpretation of "Type 1 Rental." The Ordinance defines a Type 1 rental as follows: "A short-term rental where the principal use of the property remains as a full-time residence. The occupants or owner rent their primary residence as a short-term rental." § 118.01(E)(1). Plaintiffs make much of the word "their": they contend that "their primary residence" means only the occupant can get a Type 1 license, completely foreclosing non-occupant owners from entering the Type 1 market. (Doc. 18-1, p. 5).

---

[2] Plaintiffs argue that a long-term lease, accepted by both the *Rosenblatt* and *MDKC* courts, *see infra*, as a way for non-resident owners to enter the STR market, is "unworkable." (Doc. 18-1, p. 6). Plaintiffs cite no evidence for this proposition and the Court would be surprised to learn that there is "no meaningful market" for nine-month lease terms in a college town like Fayetteville. *Id.* Further, it is not clear to the Court why Plaintiffs' daughter who lives in Fayetteville and is the purported reason for purchasing the house cannot live in it during the school year, which would allow Plaintiffs to operate the house as a Type 1 STR. The Court is left with the distinct impression that Plaintiffs would not, in fact, be satisfied if they were allowed to operate their home as a whole-home STR for just three months of the year under a Type 1 license.

Plaintiffs' interpretation of the Ordinance is incongruous with its other provisions.[3] In fact, the licensing provision of the Ordinance requires that "[t]he owner of the dwelling unit *or* operator of the short-term rental possess a valid and current business license," not that the primary resident possess the license. § 118.01(E)(3)(a) (emphasis added). Further, the Ordinance requires that the "property *owner* or a designated agent are . . . able to be physically present at the short-term rental within three (3) hours of being contacted," indicating that the Ordinance contemplates owners, rather than only primary residents, being able to hold STR licenses. § 118.01(E)(10) (emphasis added). Thus, the Court does not agree with Plaintiffs that out-of-state owners are foreclosed from holding Type 1 STR licenses under the Ordinance.

Plaintiffs also seek to distinguish *Rosenblatt* by pointing out that the Santa Monica ordinance required that a primary resident be present during rentals, while the Fayetteville Ordinance requires only that the primary resident occupy the house nine months of the year, allowing Type 1 license-holders to operate whole-home rentals for the other three months. This, Plaintiffs argue, discriminates against out-of-staters because Fayetteville residents can "pick the profitable weekends" to offer whole-home rentals under a Type 1 license while living in the house the rest of the year. Out-of-staters, who definitionally do not live in Fayetteville, can only offer whole-home rentals under the more-difficult-to-obtain Type 2 license, although they can do so all twelve months of the year.

---

[3] Additionally, the *MDKC* court, *see infra*, dealt with an ordinance that did, in fact, require the license-holder to be the primary resident and still found no dormant Commerce Clause violation. *MDKC, LLC v. City of Kansas City*, 2023 WL 6406403, at *2, *7 (W.D. Mo. Oct. 2, 2023).

Plaintiffs acknowledge, however, that our sister court recently upheld Kansas City's STR ordinance, which required that the primary resident occupy the house 270 days (approximately nine months) per year to obtain Kansas City's Type 1 license equivalent. *MDKC, LLC v. City of Kansas City* (*MDKC I*), 2023 WL 6406403 (W.D. Mo. Oct. 2, 2023); *MDKC, LLC v. City of Kansas City* (*MDKC II*), 2024 WL 2852149 (W.D. Mo. June 5, 2024). The plaintiffs there made the same argument as Plaintiffs here: out-of-staters cannot operate whole-home Type 1 STRs "because they are unable to live at the property for 270 days per year by virtue of living out of state. Comparatively, [local] homeowners can freely live in their home for 270 days and then operate it as a whole-home STR for the remainder of the year." *MDKC II*, 2024 WL 2852149, at *4.

The *MDKC* court rejected this argument, finding, like the *Rosenblatt* court, that local homeowners are not similarly situated to out-of-state investors for dormant Commerce Clause purposes with respect to STR operations. *Id.* at *4–5; *Rosenblatt*, 940 F.3d at 451. The Eighth Circuit has also indicated its support for the proposition that local residents are not similarly situated to out-of-state investors, favorably citing *Rosenblatt* in the process:

> [T]he Commerce Clause was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997) (citation omitted). Accordingly, the dormant Commerce Clause doesn't prohibit differential treatment of companies that perform different services, because "any notion of discrimination assumes a comparison of substantially similar entities." *Id.* at 298. "Thus, in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference . . . ." *Id.* at 300. **State and local governments are therefore free to treat vacation homes differently from primary residences,** *Rosenblatt v. City of Santa Monica*, **940 F.3d 439, 453 (9th Cir. 2019)**, humane societies differently from for-profit breeders, *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d

495, 497–98 (7th Cir. 2017), and brick and mortar liquor stores differently from their online counterparts, *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36–37 (1st Cir. 2007), to name a few examples.

*Paul's Indus. Garage, Inc. v. Goodhue Cnty.*, 35 F.4th 1097, 1099–100 (8th Cir. 2022) (emphasis added). This Court agrees. Because non-resident homeowners are not similarly situated to local residents in their ability to personally serve as primary residents for Type 1 STRs, the Ordinance does not discriminate against interstate commerce by treating Type 1 and Type 2 STRs differently based on occupancy by a primary resident. Therefore, *Pike* balancing applies.

Applying *Pike*, the Court now considers whether Plaintiffs have shown that the burden the Ordinance imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." 397 U.S. at 142. Here, Plaintiffs argue only that the Ordinance is discriminatory and strict scrutiny should therefore apply; they do not address what, if any, burdens the statute imposes on interstate commerce.[4] Therefore, Plaintiffs have not shown that they are likely to succeed on their dormant Commerce Clause claim.

---

[4] Plaintiffs accuse the *Rosenblatt* court of failing to engage with the purportedly relevant Supreme Court case *Granholm v. Heald*, 544 U.S. 460 (2005), offering that "[p]erhaps the plaintiffs in the *Rosenblatt* case simply failed to plead the necessary facts to demonstrate the prohibitive expense associated with the schemes." But they, too, have pled no facts demonstrating the prohibitive expense associated with the Ordinance. (Doc. 18-1, p. 7). Like the *Rosenblatt* court, this Court finds that the Ordinance does not "require an out-of-state [owner] 'to become a resident in order to compete on equal terms.'" 940 F.3d at 451 n.5 (quoting *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 736 (9th Cir. 2017)). What Plaintiffs seek, instead, is for out-of-state owners to be given more favorable terms than in-state owners by being exempted from the Type 1 license requirement that they (or someone they rent to) occupy the property nine months of the year.

ii. Void for Vagueness

Plaintiffs' next justiciable claim is that the Ordinance is unconstitutionally vague. The Ordinance requires a conditional use permit to operate a Type 2 STR in certain residential zoning districts. §§ 118.01(E)(2), 163.18(A). The Ordinance lists several factors for the Planning Commission to consider including, as relevant here, the "[f]requency or concentration of nearby licensed Type 2 short-term rentals." *Id.* § 163.18(H)(3). Plaintiffs contend that the Ordinance is unconstitutionally vague because it "does not provide any guidance as to what constitutes an acceptable 'frequency or concentration' of short-term rentals or even what constitutes 'nearby.'" (Doc. 18-1, pp. 15–18). [5]

Vagueness doctrine is principally concerned with the regulation of conduct. *See Lanzetta v. State of N.J.*, 306 U.S. 451, 453 (1939); *Boutilier v. Immigr. & Naturalization Serv.,* 387 U.S. 118, 123 (1967) ("The section imposes neither regulation of nor sanction for conduct. In this situation, therefore, no necessity exists for guidance so that one may avoid the applicability of the law."). Here, there is no doubt about what conduct is prohibited. Plaintiffs do not doubt that they are forbidden from operating their house as a Type 2 STR without a permit. Instead, they assert that the Ordinance is vague because they could not accurately predict whether a permit would be granted without applying. The cases Plaintiffs cite foreclose this argument.

---

[5] It appears from the record that the challenged factor was not the only basis for Plaintiffs' CUP denial. The Planning Commission also cited the lack of on-street parking due to ongoing construction in its decision. (Doc. 18-3, p. 7). Because Plaintiffs are only permitted to bring an as-applied challenge here, *see Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 569 (8th Cir. 2024), it is not clear whether they can challenge one of the factors used to deny their CUP application when another factor, which they do not claim is unconstitutionally vague, also justifies the denial.

"In the area of land use, a conditional use standard must be sufficiently specific to guide both an applicant in presenting his case and the Board in examining the proposed use." *Rolling Pines Ltd. P'ship v. City of Little Rock*, 73 Ark. App. 97, 105 (2001). That is not to say, however, that planning commissions or boards may not use discretionary restraints—the Arkansas Supreme Court has expressly approved such restraints so long as an ordinance "does not grant unbridled discretion." *Benton Cnty. Stone Co. v. Benton Cnty. Plan. Bd.*, 374 Ark. 519, 526 (2008). Further, although Plaintiffs protest the "case-by-case" nature of the City's CUP decisions, the *Rolling Pines* case which they rely on notes that CUP decisions "involve[ ] the exercise of discretion and necessitate[ ] a quasi-administrative or quasi-judicial consideration." 73 Ark. App. at 104 (quoting Robert R. Wright, *Zoning Law in Arkansas: A Comparative Analysis*, 3 U. Ark. Little Rock L.J. 421, 452–53 (1980)). Thus, the problem with a statute "so vague and standardless that it leaves judges free to decide, without any legally fixed standards, what is prohibited and what is not on a case-by-case basis" is not the case-by-case basis—such decisions are inherent in the nature of judging—it is the "without any legally fixed standards." *Benton Cnty. Stone*, 374 Ark. at 522.

In *Benton County Stone*, the Arkansas Supreme Court found that the term "compatibility" in a land-use ordinance was not unconstitutionally vague. *Id.* at 525–26. There, the ordinance enumerated three factors to guide the Board's discretion in assessing compatibility: clustering, right to farm, and right to operate. "Clustering" there was basically the opposite of "frequency or concentration" here—there, certain uses were encouraged to cluster together to maximize compatibility, whereas here, Type 2 STRs are encouraged to spread out to maximize compatibility. There, the clustering factor

provided none of the "quantitative standards" Plaintiffs demand here but was upheld. *Id.* at 523; *see also Grayned v. City of Rockford*, 408 U.S. 104, 112 (1972) (approving law where "the prohibited *quantum* of disturbance [was] not specified"); *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958–59 (8th Cir. 2019) (holding that, even where First Amendment interests were implicated, law at issue did not need to "declare how an entity's 'principal business purpose' is quantified").

Here, too, the ordinary meanings of "frequency"[6] and "concentration"[7] are sufficiently specific to clearly proscribe Plaintiffs' desired permit. Five houses out of a fifty-six-house neighborhood can easily be considered "frequent" or "concentrated," especially comparing the concentration in Plaintiffs' neighborhood to the city-wide density cap of 435 Type 2 STRs out of tens of thousands of housing units. And Plaintiffs cannot challenge the Ordinance as vague based on its potential applicability in other contexts, *e.g.*, when there are more houses in the subdivision in the future. *Id.* at 958. The City is not required to set out by ordinance a fixed percentage of Type 2 STRs permitted in each

---

[6]    *See Frequency*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/frequency [https://perma.cc/Q8BP-PTWV] ("the number of times something happens within a particular period, or the fact of something happening often or a large number of times"); *Frequency*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/frequency [https://perma.cc/RU88-MYXQ] ("the fact or condition of occurring frequently"); *Frequency*, Oxford English Dictionary, https://www.oed.com/dictionary/frequency_n?tab=meaning_and_use [https://perma.cc/7LKC-47XD] ("The fact of occurring often or being repeated at short intervals.").

[7]    *See Concentration*, Cambridge Dictionary, https://dictionary.cambridge.org/dictionary/english/concentration [https://perma.cc/JP5M-CWG5] ("a large number or amount of something in the same place"); *Concentration*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/concentration [https://perma.cc/GXN9-99KQ] ("a concentrated mass or thing"); *Concentration*, Oxford English Dictionary, https://www.oed.com/dictionary/concentration_n?tab=meaning_and_use [https://perma.cc/JEU8-PX78] ("The action or an act of coming together at a single place, point, or focus, esp. with a resultant increase in intensity or power . . . .").

neighborhood. *See id.* at 959. Further, there is no indication that the Ordinance allowed arbitrary or discriminatory enforcement. Plaintiffs admit that "the Planning Commission had already denied six conditional use permit applications in the same neighborhood prior to its hearing Plaintiffs' application." (Doc. 18-1, p. 18).

Finally, the Court notes its concern "that federal courts not sit as zoning boards of appeals 'when presented with claims which, although couched in constitutional language, at bottom amount only to "the run of the mill dispute between a developer and a town planning agency."'" *Littlefield*, 785 F.2d at 607 (8th Cir. 1986) (quoting *Scott v. Greenville Cnty.*, 716 F.2d 1409, 1419 (4th Cir. 1983)). Here, where the Ordinance does not "impos[e] criminal sanction or implicat[e] constitutionally protected behavior," the constitutional demand for definiteness is at its lowest. *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)). The Plaintiffs have not shown a likelihood of success on the merits of their vagueness challenge; it seems that what Plaintiffs actually take issue with is the City's grant of discretion to the Planning Commission, a challenge surely more suited to state court resolution. *See Chesterfield Dev. Corp. v. City of Chesterfield*, 963 F.2d 1102, 1104 (8th Cir. 1992).

### iii.  Takings Clause

Plaintiffs' final justiciable claim is that the Ordinance violates the Takings Clause. "The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just compensation.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). Plaintiffs' primary argument is that the Ordinance constitutes an unlawful

private taking because it was enacted "to enrich private persons, namely hotel owners and those working in the hotel industry." (Doc. 18-1, p. 21). Plaintiffs point to statements in a City Council resolution to develop STR regulations and its accompanying whitepaper. The resolution states that "there are many benefits from regulation of short-term rentals including . . . ensuring a level playing field between traditional homes, hotels, and illegal short-term rentals." The whitepaper states that "[l]ocal service jobs can be jeopardized as unfair competition from unregulated and untaxed short-term rentals reduces demand for local bed & breakfasts, hotels, and motels." (Doc. 18-2, pp. 1, 7).

While Plaintiffs urge that "protecting local hotels from competition at the expense of individual property owners (and transients) is not a legitimate government purpose," Takings Clause jurisprudence embraces a "traditionally broad understanding of public purpose." Doc. 11, ¶ 54; *Kelo v. City of New London*, 545 U.S. 469, 485 (2005). There is no private taking so long as the government action "is rationally related to a conceivable public purpose." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). Thus, the Supreme Court has upheld "breaking up a land oligopoly that 'created artificial deterrents to the normal functioning of the State's residential land market'" and forced data sharing "to promot[e] competition in the pesticide market" as acceptable public takings. *Id.* (first quoting *Midkiff*, 467 U.S. at 242; and then citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1015 (1984)).

Far from "protecting hotels from competition," the Ordinance in fact promotes competition by helping to remove the unfair competitive advantage conferred on STR operators who were able, prior to the Ordinance, to do their business under the table, without the burdens of the health and safety regulations and hefty tax bills to which hotels

are subject. The fact that the expense of competing falls on the heretofore unregulated group does not obviate the public interest in a competitive market. The Ordinance is rationally related to that purpose, so Plaintiffs have not demonstrated that the regulations amount to a private taking.

For public takings, claims generally fall into one of two categories: *per se* takings or regulatory takings. It is not clear which type of taking Plaintiffs are alleging, so the Court will address both. A *per se* taking occurs when the government "requires an owner to suffer a permanent physical invasion of her property" or when a regulation "completely deprive[s] an owner of '*all* economically beneficial us[e]' of her property." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (second alteration in original) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). Here, Plaintiffs have not alleged any physical invasion of their house, nor have they alleged that the Ordinance deprives them of all economically beneficial use of the house.

A regulatory taking, on the other hand, is not "specifically defined by formula or rule." *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 278 (8th Cir. 1993). Instead, courts must conduct an "ad hoc factual inquir[y]" taking into account the following factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government regulation." *Id.* (citing *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124 (1978)).

On the first factor, Plaintiffs have alleged only that the Ordinance deprives them of their desired use of the property, but they have made no showing that it has affected the economic, rather than personal, value of the house. *See Village of Euclid v. Ambler Realty*

27

*Co.*, 272 U.S. 365 (1926) (holding that zoning law which resulted in 75% diminution in value did not constitute a taking); *Iowa Coal Min. Co. v. Monroe Cnty.*, 257 F.3d 846, 853 (8th Cir. 2001) (holding that ordinance which deprived property of its "most beneficial use" did not constitute a taking).

On the second factor, Plaintiffs allege that the Ordinance interferes with their reasonable and distinct investment-backed expectations. At the time Plaintiffs purchased the house, the Ordinance was already in effect. "A reasonable restriction that predates a landowner's acquisition . . . can be one of the objective factors that most landowners would reasonably consider in forming fair expectations about their property." *Murr v. Wisconsin*, 582 U.S. 383, 398 (2017). Here, a reasonable buyer would have considered the possibility that they would not be able to get the permit and license necessary to operate an STR in forming their expectations about the property.

Further, Plaintiffs have never actually operated the house as an STR. "[L]oss of future profits-unaccompanied by any physical property restriction-provides a slender reed upon which to rest a takings claim." *Andrus v. Allard*, 444 U.S. 51, 66 (1979). Here, Plaintiffs do not point to any data about future profitability, so the Court is unable to engage in even "reasoned speculation." *Id.* Considering Plaintiffs have asserted only this "less compelling" interest in "anticipated gains" coupled with the fact that they knew about the Ordinance before purchasing, Plaintiffs have not shown that the Ordinance interfered with their distinct, investment-backed expectations. *Id.*

On the third factor, Plaintiffs have made no allegation that the Ordinance involves a physical invasion. "A 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government than when

interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Cent.*, 438 U.S. at 124. Here, the Ordinance is plainly a public program aimed at increasing the burdens on STRs for the benefit of the common good in Fayetteville.

None of the *Penn Central* factors weigh in favor of finding a taking here: Plaintiffs have shown no economic harm, their distinct investment-backed expectations amount to nothing more than the hope of future profit, and the Ordinance works no physical invasion on their property. Therefore, Plaintiffs have not shown a likelihood of success on the merits of their Takings Clause claim.

### 2.  Likelihood of Irreparable Harm

Plaintiffs argue that they are suffering, and will continue to suffer, irreparable harm because "Plaintiffs rely on the ability to rent the property out on a short-term basis in between visits in order to help cover the expenses associated with maintaining a second home" and because "Plaintiffs have made several cognizable claims that the STR Ordinance has violated their constitutional rights." (Doc. 18-1, p. 25).

"[F]ailure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Beber v. NavSav Holdings, LLC*, 118 F.4th 921, 929 (8th Cir. 2024) (alteration in original) (quoting *Padda v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022)). "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Id.* (quoting *Cigna Corp. v. Bricker*, 103 F.4th 1336, 1346 (8th Cir. 2024)). "Economic loss, on its own, is not an irreparable [harm] so long as the losses can be

recovered." *Id.* (alteration in original) (quoting *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 597 (8th Cir. 2022)).

Here, while Plaintiffs assert constitutional claims, their injuries are entirely economic in nature, and compensatory damages are an available remedy in this lawsuit. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The City has not asserted that it is insulated from such damages under *Monell*'s "policy or custom" requirement, nor could it because an ordinance is explicitly contemplated as a qualifying policy in *Monell*. *See id.* Plaintiffs argue, however, that "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (Doc. 18-1, p, 25 (quoting *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012)). But the Eighth Circuit has never so held, instead looking to the nature of the actual injury alleged.

For example, in *Roberts v. Van Buren Public Schools*, 731 F.2d 523 (8th Cir. 1984), non-renewed teachers brought actions "under 42 U.S.C. § 1983 claiming violation of their first, fifth and fourteenth amendment rights in the nonrenewal of their teaching contracts." *Id.* at 524. The court found preliminary injunctive relief improper because if the teachers "prevail[ed] on the merits of their action they would be entitled to reinstatement and backpay relief." Therefore, since "such relief would offer a complete remedy, the requirement of irreparable harm upon which a preliminary injunction must be based [wa]s not met." *Id.* at 526. Here too, if Plaintiffs prevail on their constitutional claims, under § 1983 they will be entitled to compensatory damages which would offer a complete remedy for the economic harm suffered, so they have not made out a claim for irreparable harm.

### 3. Balance of Equities and the Public Interest

"The third and fourth factors for a preliminary injunction—harm to the opposing party and the public interest—merge when the Government is the party opposing the preliminary injunction." *Morehouse Enterprises, LLC v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 78 F.4th 1011, 1018 (8th Cir. 2023) (citing *Nken v. Holder*, 556 U.S. 418, 436 (2009)). Plaintiffs bear the burden of persuasion on their entitlement to a preliminary injunction. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). In their Motion, Plaintiffs offer no reason why the balance of harms and public interest favor their position beyond the fact that they have alleged constitutional violations. (Doc. 18-1, p. 25). And at the preliminary injunction hearing, they asserted that the house was currently vacant and "allowing them to rent it out . . . would not create any harm to the community."

First, this statement inverts the standard: it is not enough that an injunction simply not harm the public. Instead, the injunction must affirmatively further the public interest. Second, the people of Fayetteville and their elected representatives have determined that STRs *do* harm the community—that is why the Ordinance was enacted. And the Court is not persuaded that Plaintiffs' private financial interest in renting the house in their preferred manner outweighs the City's interest in enforcing its democratically enacted laws and the public's interest in having those laws enforced. Thus, the balance of the equities does not favor Plaintiffs.

"At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113. Granting Plaintiffs desired injunction would disrupt, not preserve the status quo. The Ordinance was in effect when Plaintiffs bought

the house, and it is in effect now. Plaintiffs have *never* been authorized to operate the house as an STR. The Court will not disrupt the status quo to permit them to do so while this case is pending. Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

### III. CONCLUSION

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion for Preliminary Injunction (Doc. 18) is **DENIED**.

**IT IS FURTHER ORDERED** that Counts II and V of Plaintiffs' Amended Complaint (Doc. 11) are **DISMISSED WITHOUT PREJUDICE** for lack of standing.

**IT IS SO ORDERED** on this 19th day of December, 2024.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE