IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHELLEY HAUSE and STEPHEN HAUSE                                              PLAINTIFFS

V.                          CASE NO. 5:24-CV-5143

CITY OF FAYETTEVILLE, ARKANSAS                                                DEFENDANT

# MEMORANDUM OPINION AND ORDER

## TABLE OF CONTENTS

I.  BACKGROUND ................................................................................................... 2

II. LEGAL STANDARD ............................................................................................ 4

III. DISCUSSION ...................................................................................................... 4

   A. Dormant Commerce Clause ........................................................................... 4

   B. Void for Vagueness ...................................................................................... 12

   C. Takings Clause ............................................................................................. 15

IV. CONCLUSION .................................................................................................. 18

Now before the Court are the parties' cross-motions for summary judgment (Docs. 26 & 34).[1] Both motions are fully briefed, and the facts are not disputed. For the reasons that follow, the City of Fayetteville's Motion for Summary Judgment (Doc. 26) is **GRANTED**, Plaintiffs Shelley and Stephen Hause's Motion for Summary Judgment (Doc. 34) is **DENIED**, and the case is **DISMISSED WITH PREJUDICE**.

---

[1] The City asserts that Plaintiffs' Motion is untimely because it was filed more than thirty days after the end of the parties' agreed discovery period. However, the Court failed to enter a case management order adopting the parties' agreed discovery period and setting a deadline for dispositive motions. The Court therefore will not penalize Plaintiffs for the timing of their summary judgment motion.

1

## I. BACKGROUND

In 2021, the City of Fayetteville passed an ordinance (the "Ordinance") regulating short-term rentals ("STRs"), residential dwelling units or portions thereof leased or rented "for a period of less than thirty (30) consecutive days." (Doc. 28, ¶ 3; Fayetteville, Ark., Code of Ordinances § 118.01(E) (2025)). Before the Ordinance's enactment, STRs were treated as hotels/motels and were therefore prohibited from operating in residential zoning districts, but hundreds of illegal STRs were in operation nonetheless. (Doc. 2-1; Doc. 28, ¶ 1). The Ordinance made it legal to operate STRs in residential zoning districts subject to certain restrictions.

Fayetteville's regulatory scheme divides STRs into two types which are subject to different requirements. Type 1 STRs are those "where the owner or long-term tenant occupies the principal dwelling . . . as their primary full-time residence for at least nine (9) months of each calendar year and rents the remaining portion of their residence . . . as a short-term rental."[2] Fayetteville, Ark., Code of Ordinances § 118.01(E)(1) (2025). Type 2 STRs are those that "do[ ] not qualify as a short-term rental, Type 1." *Id.* § 118.01(E)(2). Operators of both types of STRs are required to, among other things, obtain and maintain business licenses, comply with occupancy limits, maintain guest registration records, and pay the Fayetteville Hotel, Motel and Restaurant tax. *Id.* § 118.01(E)(3)–(15). But someone seeking to operate a Type 2 STR in a residential zoning district must also obtain a conditional-use permit, and such permits are subject to density restrictions including a

---

[2] The City has amended the definitions of Type 1 and 2 since this suit was filed although the changes do not materially alter the regulatory environment. The Court quotes and references the current versions. Plaintiffs' desired use of their house would be considered "Type 2" under either set of definitions.

2

city-wide cap of 475 on the total number of Type 2 STRs. *Id.* §§ 118.01(E)(16), 163.18(A). Such permits "may be permitted by right or by conditional use . . . subject to the zoning regulations enacted by the City Council . . . ." *Id.* § 163.18(A). And such permits "may be subject to denial . . . based upon the Planning Commission's findings" on a number of factors including the "[f]requency or concentration of nearby licensed Type 2 short-term rentals." *Id.* § 163.18(H).

In 2023, after the Ordinance went into effect but before the 475 cap was reached, Plaintiffs bought a house in Fayetteville. (Doc. 36, ¶¶ 4–5). They intended to use the house "personally upon their frequent visits to Fayetteville" and "as a short-term rental" the rest of the time. *Id.* ¶ 4. They applied for a conditional-use permit, but the Fayetteville Planning Commission unanimously denied their application because there were already four Type 2 STRs operating in the 56-house subdivision and there was limited street parking available due to ongoing construction. (Doc. 28, ¶¶ 9, 11). "Prior to Plaintiffs' application . . . , the Fayetteville Planning Commission had previously denied six other Type 2 short-term rental applications for dwellings in the area due to concerns about density and parking." *Id.* ¶ 10.

Plaintiffs filed this lawsuit on July 14, 2024, bringing five constitutional challenges to the Ordinance. (Doc. 2). Plaintiffs sought a preliminary injunction and the City moved to dismiss. The Court denied Plaintiffs' request for a preliminary injunction, finding they were not likely to succeed on the merits, and dismissed two of their five claims. *See* Doc. 25. The following claims remain: the Ordinance violates the dormant Commerce Clause, is void for vagueness, and constitutes a taking without just compensation. Plaintiffs now seek summary judgment in their favor and a permanent injunction against enforcement

of the Ordinance, while the City seeks summary judgment and dismissal of Plaintiffs' remaining claims.

## II. LEGAL STANDARD

A party moving for summary judgment must establish the absence of a genuine dispute of material fact and its entitlement to judgment as a matter of law. *See* Fed. R. Civ. P. 56; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Nat'l Bank of Commerce of El Dorado, Ark. v. Dow Chem. Co.*, 165 F.3d 602 (8th Cir. 1999). The same standard applies where, as here, the parties have filed cross-motions for summary judgment. When there exists no genuine issue as to any material fact, "summary judgment is a useful tool whereby needless trials may be avoided, and it should not be withheld in an appropriate case." *United States v. Porter*, 581 F.2d 698, 703 (8th Cir. 1978). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III. DISCUSSION

### A. Dormant Commerce Clause

Plaintiffs assert that the Ordinance violates the so-called dormant Commerce Clause because it discriminates against out-of-state residents "by offering a less burdensome licensing option [Type 1] exclusively to properties occupied by a Fayetteville resident for nine-months [sic] out of the year." (Doc. 35). The City argues that Type 1 and Type 2 STRs are not substantially similar and their differential treatment is therefore not

4

the kind of discrimination the Dormant Commerce Clause is concerned with.

The Commerce Clause gives Congress the power to regulate interstate commerce. "The dormant Commerce Clause is the negative implication of the Commerce Clause: states may not enact laws that discriminate against or unduly burden interstate commerce." *Paul's Indus. Garage, Inc. v. Goodhue Cnty.*, 35 F.4th 1097, 1099 (8th Cir. 2022). "This negative aspect of the Commerce Clause prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailer Ass'n v. Thomas*, 588 U.S. 504, 514 (2019).

In determining whether a law violates the dormant Commerce Clause, courts must first determine whether the law is discriminatory and then apply the appropriate level of scrutiny. In this context, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Dep't of Env't Quality*, 511 U.S. 93, 99 (1994). However, "any notion of discrimination assumes a comparison of substantially similar entities." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997).

A discriminatory law is subject to strict scrutiny; it is "virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008) (citation modified). A non-discriminatory law is subject to *Pike* balancing; it is unconstitutional "if the burden it imposes upon interstate commerce is clearly excessive in relation to the putative local benefits." *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018, 1026 (8th Cir. 2020) (citation modified) (citing *Pike v. Bruce Church, Inc.*, 397

U.S. 137 (1970)).

There is a circuit split on the constitutionality of STR restrictions under the dormant Commerce Clause. The Ninth Circuit held that Santa Monica's STR ordinance, which banned STRs unless a primary resident was on site throughout the stay, did not violate the dormant Commerce Clause. *Rosenblatt v. City of Santa Monica*, 940 F.3d 439 (9th Cir. 2019). The Fifth Circuit, by contrast, held that New Orleans' STR ordinance, which allowed STR licenses only for an owner's primary residence, violated the dormant Commerce Clause. *Hignell-Stark v. City of New Orleans*, 46 F.4th 317 (5th Cir. 2022).

The two courts disagreed about whether the STR ordinances discriminated between substantially similar entities by having a residency or ownership requirement to operate an STR. The *Rosenblatt* court found that Santa Monica's ordinance did not discriminate between substantially similar entities by requiring a primary resident to be on site during STR bookings because "[w]hile non-resident property owners cannot personally serve as the primary resident whose presence is required during the home share, that is because they are not similarly situated to the Santa Monica residents who can." 940 F.3d at 451. The *Hignell-Stark* court, on the other hand, found that New Orleans' ordinance did discriminate between substantially similar entities by requiring STRs to be operated out of a property owner's primary residence because both occupant and non-occupant owners "want to offer the same services to the same customers in the same locations." 46 F.4th at 326. The *Rosenblatt* court therefore applied *Pike* balancing which the Santa Monica ordinance survived, while the *Hignell-Stark* court applied strict scrutiny which was, in fact, fatal. *Rosenblatt*, 940 F.3d at 453; *Hignell-Stark*, 46 F.4th at 329.

6

As the Court previously found in its preliminary injunction order, the Fayetteville Ordinance looks more like the Santa Monica ordinance than the New Orleans ordinance because it does not require STRs to be owner-occupied, thereby allowing out-of-state owners to enter the market on the same terms as in-state owners. Thus, out-of-state owners like Plaintiffs can get Type 1 licenses by leasing a house to a long-term tenant for nine months of the year. And Plaintiffs' desired Type 2 permit is available on identical terms to residents and non-residents alike (but is unavailable to Plaintiffs for reasons unrelated to their out-of-state status).

The Court finds the *Hignell-Stark* decision unpersuasive, not least of all because it runs counter to Eighth Circuit precedent. In *Paul's Industrial Garage, Inc. v. Goodhue County*, the Eighth Circuit stated:

> [T]he Commerce Clause was "never intended to cut the States off from legislating on all subjects relating to the health, life, and safety of their citizens, though the legislation might indirectly affect the commerce of the country." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 306 (1997) (citation omitted). Accordingly, the dormant Commerce Clause doesn't prohibit differential treatment of companies that perform different services, because "any notion of discrimination assumes a comparison of substantially similar entities." *Id.* at 298. "Thus, in the absence of actual or prospective competition between the supposedly favored and disfavored entities in a single market there can be no local preference . . . ." *Id.* at 300. **State and local governments are therefore free to treat vacation homes differently from primary residences, *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 453 (9th Cir. 2019)**, humane societies differently from for-profit breeders, *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 497–98 (7th Cir. 2017), and brick and mortar liquor stores differently from their online counterparts, *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36–37 (1st Cir. 2007), to name a few examples.

35 F.4th at 1099–100.

Plaintiffs urge the Court to reach a contrary conclusion—that Type 2 rentals cannot be treated differently from Type 1—based on an expansive conception of what constitutes a single market: "Here, as in New Orleans, the 'service' being provided is the rental of

7

lodging to paying guests . . . ." (Doc. 38, p. 3). Putting aside the fact that the New Orleans ordinance permitted only *owners* to operate STRs, Plaintiffs' expansive theory of markets would impose correspondingly circumscribed local government power to regulate different industries differently. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 343 (2007) ("The dormant Commerce Clause is not a roving license for federal courts to decide what activities are appropriate for state and local government to undertake, and what activities must be the province of private market competition."). On Plaintiffs' telling, governments could not distinguish between humane societies and for-profit breeders because they both provide pets to paying customers, or between brick and mortar liquor stores and their online counterparts because they both sell liquor. Such an expansive conception of a "market" is unsupported by law or common sense. *See Alaska v. Arctic Maid*, 366 U.S. 199, 204–05 (1961) (concluding that fish destined for out-of-state canning were not competitors of fish destined for fresh-frozen retail sale, so their differential tax treatment did not run afoul of the Commerce Clause).

Plaintiffs also focus their analysis solely on the area of commonality between Type 1 and 2 STRs—the three months during which a Type 1 STR can compete with Type 2 STRs in the whole-home STR market. But this argument ignores the distinguishing feature between Type 1 and 2—the other nine months during which Type 1 rentals must serve as primary full-time residences while Type 2 rentals continue to operate as STRs. Plaintiffs do not argue, nor could they, that long-term residential leases are substantially similar to or directly compete with STRs. *Compare* Zillow, https://www.zillow.com/, *with* Airbnb, https://www.airbnb.com/. Indeed, while in their dormant Commerce Clause discussion, Plaintiffs frame Type 1 rentals as "a less burdensome licensing option," *see*

8

Doc. 35, p. 1, their Takings Clause argument belies this framing, instead urging that the Ordinance burdens their rights by requiring them to lease on a long-term, rather than short-term, basis, just as the purportedly "less burdensome" Type 1 rental would, *see* Doc. 29, p. 5. Properly viewed, Type 1 operators are differently but no less burdened than Type 2, because Type 1 operators are required to participate for the majority of the year in what Plaintiffs implicitly concede is a less desirable market. Further, the "Ordinance applies equally to out-of-state owners and in-state-owners who reside in [Fayetteville], but at a property separate from their rental property." *MDKC, LLC v. City of Kansas City*, 2023 WL 6406403, at *7 (W.D. Mo. Oct. 2, 2023). Because Type 1 rentals must remain primary full-time residences, they are not similarly situated to Type 2 rentals for purposes of the dormant Commerce Clause.

For the same reason, Plaintiffs' argument that the Ordinance discriminates against out-of-staters by "requiring [them] to enlist the support of locals to operate" must also fail. (Doc. 35, p. 3 (citing *Granholm v. Heald*, 544 U.S. 460 (2005)). In *Heald*, the Supreme Court struck down state laws that allowed in-state wineries to ship directly to consumers but required out-of-state wineries to establish various in-state distribution operations to do the same. 544 U.S. at 473–75. Such "differential treatment" is inconsistent with the Constitution's dictates because it "deprive[s] citizens of their right to have access to the markets of other States on equal terms." *Id.* at 472–73.

Plaintiffs, however, cannot complain of differential treatment here, nor do they seek equal access to the whole-home STR market. The Ordinance does not "require an out-of-state [owner] 'to become a resident in order to compete on equal terms.'" *Rosenblatt*, 940 F.3d at 451 n.5 (quoting *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716,

736 (9th Cir. 2017)). Instead, both in-state and out-of-state owners who wish to operate Type 1 STRs must jump through the same hoop: acquiring a primary full-time resident. And even then, their access to the whole-home STR market is limited to three months of the year. But Plaintiffs seek to operate their home as a Type 1 STR without jumping through that hoop and for as much of the year as they want. The dormant Commerce Clause certainly does not entitle non-residents to *more favorable* terms than residents.

Plaintiffs also argue that "[w]hether nonresident and resident homeowners are similarly situated for purposes of operating short-term rentals depends on the legal character of short-term rentals themselves." (Doc. 35, p. 5). They argue that STRs must either be residential[3] or commercial in nature and that "[t]he nature of renting out a property on a short-term basis is the same regardless of how many times it is done." *Id.* Therefore, whether residential or commercial, Type 1 and Type 2 rentals are not rendered dissimilar based on the duration of their whole-home STR use. The Court rejects both the premise and the conclusion.

First, Plaintiffs do not present and the Court is not aware of any case where the dormant Commerce Clause analysis depended on how a zoning board would classify a property—maybe because most dormant Commerce Clause cases do not deal with land use regulations. Courts instead look to the realities of the market. *See Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 287–99 (1997) ("Assessing [whether the tax at issue is discriminatory] requires an understanding of the historical development of the

---

[3] Plaintiffs argue that if the Court concludes that the use of STRs is residential in nature, then the law raises separate right-to-privacy concerns by regulating who Plaintiffs can invite into their home. Plaintiffs have not pled a right-to-privacy claim, nor are privacy concerns a relevant consideration in analyzing their dormant Commerce Clause claim.

10

contemporary retail market for natural gas . . . ."). Second, the frequency or duration of whole-home STR use does affect a change in kind, not degree, by completely removing a property from the full-time residence market.

In sum, the Ordinance does not discriminate against out-of-state economic interests. Thus, *Pike* balancing applies. "Where the statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142. The party "challenging the legislative action ha[s] the burden of showing that the statute's burden on interstate commerce exceeds its local benefit." *LSP Transmission*, 954 F.3d at 1026 (citation modified).

As in their preliminary injunction briefing, Plaintiffs only argue that the Ordinance is discriminatory but do not address the Ordinance's burden on interstate commerce in relation to local benefits. The City of Fayetteville has a "legitimate interest in local neighborhood preservation, continuity, and stability." *Nordlinger v. Hahn*, 505 U.S. 1, 12 (1992) (citation omitted). "The regimes of boarding houses, fraternity houses, and the like present urban problems." *Vill. of Belle Terre v. Boraas*, 416 U.S. 1, 9 (1974). The party "challenging the legislative action ha[s] the burden of showing that the statute's burden on interstate commerce exceeds its local benefit," and Plaintiffs have not made that showing here. *LSP Transmission*, 954 F.3d at 1026. The City's Motion for Summary Judgment (Doc. 26) is accordingly **GRANTED** as to Plaintiffs' dormant Commerce Clause claim (Count I).

11

## B. Void for Vagueness

Plaintiffs also challenge the Ordinance as impermissibly vague under the Fourteenth Amendment's Due Process Clause and under Arkansas law. They contend that the Ordinance is unconstitutionally vague and violates Arkansas law "because it allows the Fayetteville Planning Commission to consider 'frequency or concentration of nearby licensed Type 2 short-term rentals' when deciding whether to grant a conditional use permit but fails to provide any further guidance or measurable standards." (Doc. 35, p. 7 (quoting Fayetteville, Ark., Code of Ordinances § 163.18(H)(3) (2025))).

"The void-for-vagueness doctrine . . . 'addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way.'" *Sanimax USA, LLC v. City of S. St. Paul*, 95 F.4th 551, 569 (8th Cir. 2024) (quoting *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). But even when criminal punishment or constitutional rights are involved, the Constitution permits "[l]aws with 'flexibility and reasonable breadth'"; quantitative standards are not required. *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958–59 (8th Cir. 2019) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). "In the area of land use, a conditional use standard must be sufficiently specific to guide both an applicant in presenting his case and the Board in examining the proposed use." *Rolling Pines Ltd. P'ship v. City of Little Rock*, 73 Ark. App. 97, 105 (2001).

Where there is no First Amendment interest at stake, a plaintiff may bring only an as-applied challenge. *Nygard v. City of Orono*, 39 F.4th 514, 519 (8th Cir. 2022). And the

constitutional demand for definiteness is at its lowest when the challenged law does not "impos[e] criminal sanction or implicat[e] constitutionally protected behavior." *Woodis v. Westark Cmty. Coll.*, 160 F.3d 435, 438 (8th Cir. 1998) (citing *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)).

Elsewhere in their briefing, Plaintiffs argue that the Ordinance burdens their constitutional right to freedom of association. But the vagueness sections of their briefing are curiously devoid of this argument. And Plaintiffs have not in fact pled a First Amendment or substantive-due-process freedom-of-association claim, nor could they: Their desired course of conduct—renting their house on a short-term basis while they *are not in it*—does not implicate their freedom of association. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617–18 (1984) (recognizing "constitutionally protected 'freedom of association' in two distinct senses": a substantive due process right "to enter into and maintain certain intimate human relationships" and a First Amendment right "to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion"); *City of Dallas v. Stanglin*, 490 U.S. 19, 24 (1989) (holding that the associational activity of patronizing a dance hall is not entitled to constitutional protection under the guise of freedom of association). The Court therefore applies the "less strict vagueness test" applicable to economic regulations. *Hoffman Estates*, 455 U.S. at 498.

Plaintiffs "respectfully ask this Court to reconsider its earlier finding that the 'meanings of "frequency" and "concentration" are sufficiently specific to clearly proscribe Plaintiffs' desired permit.'" (Doc. 29, p. 2 (quoting Doc. 25, p. 24)). Plaintiffs rely on the same argument based on the same sources, and the Court reaches the same conclusion

13

for the same reasons. *See* Doc. 25, pp. 22–25.

Plaintiffs argue that the Ordinance is insufficiently specific because it lacks quantitative standards. But neither the U.S. nor the Arkansas Supreme Courts have held that quantitative standards are constitutionally required. *See Grayned*, 408 U.S. at 112 (approving law where "the prohibited *quantum* of disturbance [was] not specified"); *Benton Cnty.*, 374 Ark. at 523 (upholding ordinance that "encouraged" "clustering" of industrial developments without any quantitative standards such as how many clusters would be permitted or how close developments needed to be to form a cluster); *see also Adam & Eve*, 933 F.3d at 958 (rejecting vagueness challenge to ordinance that "d[id] not declare how an entity's 'principal business purpose [wa]s quantified"). Indeed, under Arkansas law a city may enact "minimum standards" for particular conditional-use permits and the planning commission can still "consider matters above and beyond those" standards "in assessing a conditional use" because "designating a use as a conditional one does not necessarily constitute a predetermination that the proposed use *must* be permitted." *Rolling Pines*, 73 Ark. App. at 103.

Plaintiffs' instance on quantitative standards is at odds with their concession that "mathematical certainty" is not required. (Doc. 29, p. 3). "[T]he law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree." *Nash v. United States*, 229 U.S. 373, 377 (1913). And under Arkansas law, city planning commissions maintain a high level of discretion in conditional-use permitting decisions. *Rolling Pines*, 73 Ark. App. at 104 (quoting Robert R. Wright, *Zoning Law in Arkansas: A Comparative Analysis*, 3 U. Ark. Little Rock L.J. 421, 452–53 (1980)). Plaintiffs knew that the Ordinance required a conditional-use permit to operate a Type 2 STR. The Ordinance

clearly indicates that the granting of such a permit is discretionary: "Type 2 short-term rentals *may* be permitted as a conditional use . . . ." Fayetteville, Ark., Code of Ordinances § 163.18(A) (2023) (emphasis added). And the Ordinance provided four factors that limited the exercise of the Planning Commission's discretion. *Id.* § 163.18(H); *see Benton Cnty.*, 374 Ark. at 525–26. Nothing more is required.

Plaintiffs also continue to argue that "the City has provided no indication that they applied [this] standard uniformly." (Doc. 29, pp. 2–3). But they do not dispute that the Planning Commission "denied six other Type 2 short-term rental applications for dwellings in the area" before denying Plaintiffs'. (Doc. 28, ¶ 10). The Ordinance provides a "legally fixed standard" by which to assess these conditional use permit applications, which the Planning Commission appears to have applied consistently. *Benton Cnty.*, 374 Ark. at 522. "[T]he speculative danger of arbitrary enforcement does not render [the Ordinance] void for vagueness" under the Fourteenth Amendment. *Nygard*, 39 F.4th at 520 (citation modified).

Because the Ordinance, as applied to Plaintiffs, was sufficiently definite to put them on notice and to guide the Planning Commission, and was not arbitrarily or discriminatorily applied to them, the City's Motion for Summary Judgment (Doc. 26) is **GRANTED** as to Plaintiffs' vagueness claim (Count III).

### C. Takings Clause

Plaintiffs' final claim is that the Ordinance constitutes a taking without just compensation in violation of the Fifth Amendment. "The Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of vested property rights except for a 'public use' and upon payment of 'just

compensation.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). Plaintiffs assert that the Ordinance interfered with their reasonable investment-backed expectations and therefore constitutes a taking. They also argue for the first time that the Ordinance violates their First Amendment right of free association and their substantive due process right of privacy, ostensibly as part of their takings claim. But the Takings Clause is not a catch-all for any constitutional claim bearing some relationship to property, so the Court does not consider these arguments and instead analyzes Plaintiffs' takings claim under the *Penn Central* framework, which all agree applies here.

In determining whether a land-use regulation affects a taking, courts must conduct an "ad hoc factual inquir[y]" taking into account the following factors: "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government regulation." *Armour & Co. v. Inver Grove Heights*, 2 F.3d 276, 278 (8th Cir. 1993) (citing *Penn Central Transp. Co. v. New York*, 438 U.S. 104, 124 (1978)). Plaintiffs must show a "deprivation significant enough to satisfy the heavy burden placed upon one alleging a regulatory taking." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987).

Plaintiffs only discuss the second factor, interference with distinct investment-backed expectations. They argue that they had a reasonable expectation that they would be able to use their property as an STR when they purchased it because they verified that the City had not yet reached the cap for Type 2 permits. (Doc. 35, p. 10). But "[a] reasonable investment-backed expectation must be more than a unilateral expectation or an abstract need." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) (citation

modified). Indeed, the reasonableness of a property owner's expectations "is shaped by the 'regulatory regime' that was in place" when they acquired the property. *Becker v. City of Hillsboro*, 125 F.4th 844, 858 (8th Cir. 2025), *cert. denied*, 2025 WL 1603608 (U.S. June 6, 2025). One might also expect that a reasonable investor would investigate whether other nearby property owners had been granted or denied the desired permit before purchasing. As the City rightly argues, Plaintiffs were in no way guaranteed a Type 2 permit, and to this day "they retain all legally permissible uses of the property they possessed at the time they purchased it." (Doc. 37, p. 14 n.3).

With respect to the first and third factors, Plaintiffs offer no evidence that the Ordinance has had any economic impact on their property, and the character of the regulation—"a limitation on use" rather than a "physical invasion"—weighs against this being a taking. *Becker*, 125 F.4th at 859 (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005)). None of the *Penn Central* factors weigh in favor of finding a taking here, and the Court again concludes that restrictions on STRs in residential neighborhoods do not constitute a "taking" within the meaning of the Fifth Amendment. *See*, *e.g.*, *ALA Mgmt., LLC v. Hall Cnty.*, 2024 WL 4449752, at *3 (11th Cir. Oct. 9, 2024) ("But simply because [the plaintiff] cannot use the property as exactly what it originally wanted does not mean that its investment-backed expectations are eradicated." (citation modified)); *Nekrilov v. City of Jersey City*, 45 F.4th 662, 678 (3d Cir. 2022); *Purple Munky Prop. Co., LLC v. Walnut Twp.*, 2023 WL 3069752 (S.D. Ohio Apr. 25, 2023); *cf. Hignell-Stark*, 46 F.4th at 325 (no property interest in the renewal of STR licenses).

Finally, Plaintiffs ask the Court to "reconsider its grouping of short-term rentals within the same category as hotels." (Doc. 35, p. 11). The Court's discussion of STRs'

similarity to hotels in its preliminary injunction order was in response to Plaintiffs' dismissed right-to-travel claim. (Doc. 18-1, p. 9 n.1). Whether STRs are or are not like hotels—and whether STRs are or not commercial in nature—is not relevant to the Takings Clause analysis.

For the foregoing reasons, the City's Motion for Summary Judgment (Doc. 26) is **GRANTED** as to Plaintiffs' Takings Clause claim (Count IV).

### IV.  CONCLUSION

The facts of this case are not disputed: the City of Fayetteville passed an Ordinance restricting short-term rentals which adversely affected Plaintiffs who hoped to operate a short-term rental. The City has shown that the Ordinance is constitutional, so the City is entitled to judgment as a matter of law on each of Plaintiffs' claims. The City's Motion for Summary Judgment (Doc. 26) is therefore **GRANTED**, and Plaintiffs' Motion for Summary Judgment (Doc. 34) is **DENIED**. The case is accordingly **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED** on this 22nd day of September, 2025.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE